UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,                    Case Number 23-20275

v.                                          Honorable David M. Lawson

TYRESE MARTEZ JONES,

          Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO DISMISS INDICTMENT**

Defendant Tyrese Martez Jones was charged by a grand jury with possessing a firearm as a convicted felon. He has moved to dismiss the indictment, arguing that the criminal statute under which he is charged, 18 U.S.C. § 922(g)(1), is repugnant to the Second Amendment and therefore unconstitutional. Because the nation's historical tradition of firearm regulation at the time the Amendment was adopted and thereafter included laws that are analogous to the contemporary disarmament of convicted felons, especially dangerous felons, section 922(g)(1) is a valid exercise of Congressional authority that is consistent with the Second Amendment. The motion will be denied.

I.

According to the affidavit in support of the criminal complaint initially filed in this case, on April 27, 2023, officers of the Bureau of Alcohol Tobacco and Firearms executed a search warrant on a Detroit residence connected to the defendant. During the search, ATF agents located a Colt MKIV Mustang .380 firearm in a bedroom that three other occupants of the residence identified as belonging to defendant Tyrese Jones. The firearm was recovered next to a wallet containing the defendant's identification documents. After being read his *Miranda* rights, the

defendant indicated that he possessed the firearm. He also indicated that he knew he was not entitled to possess firearms, volunteering to officers that he had 23 prior felony convictions, a perverse form of puffing, perhaps. The presentence investigation report lists 16 prior convictions, at least 13 of which are felonies, not 23. His convictions include multiple vehicle thefts, narcotics violations, domestic violence (a misdemeanor), and second-degree arson.

On May 10, 2023, a grand jury charged the defendant in a one-count indictment with possessing firearms after being convicted of a felony. Jones pleaded guilty to the crime on January 30, 2024, and sentencing was scheduled for June 6, 2024. On April 2, 2024, however, the defendant filed the present motion to dismiss the indictment on constitutional grounds, contending that the statute under which he is charged cannot withstand constitutional analysis under the new test announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). The government opposes the motion as untimely and on the merits.

II.

The Second Amendment states that a "well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Despite its plain language, the Supreme Court has determined that the Amendment guarantees an individual right to keep and bear arms irrespective of militia service. *District of Columbia v. Heller*, 554 U.S. 570, 599-600 (2008); *see also Stimmel v. Sessions*, 879 F.3d 198, 203 (6th Cir. 2018).

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court announced a new test to determine if legislation that regulates the use or possession of firearms offends the Second Amendment. In that case, the Court struck down a New York state law that required residents to demonstrate "proper cause" to obtain a license to carry a handgun outside the home,

finding that the law "prevent[ed] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms." 597 U.S. 1, 71 (2022). The Court rejected the "two-step" framework most courts of appeals adopted after *Heller*, which "combine[d] history with means-end scrutiny" in order to assess the constitutionality of regulations impacting Second Amendment rights. *See id.* at 17. Instead, it adopted a new "standard for applying the Second Amendment," *id.* at 24, one solely "rooted in the Second Amendment's text, as informed by history," *id*. at 19. First, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 24. Second, when a regulation burdens that conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Ibid*.

Jones argues that the application of that test requires this Court to invalidate 18 U.S.C. § 922(g)(1), which he says is unconstitutional on its face. The Court previously addressed and rejected a similar argument in *United States v. Keels*, 680 F. Supp. 3d 841 (E.D. Mich. 2023). There, the Court took note of the Supreme Court's statements in *Bruen*, *Heller*, and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), that consistently endorsed felon disarmament. *Keels*, 680 F. Supp. 3d at 848 (citing *Heller*, 554 U.S. at 625-26, 627 n.26 (stating that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful"); *McDonald*, 561 U.S. at 786 (emphasizing that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill'"); and *Bruen*, 597 U.S. at 17 (assuring that the decision was "[i]n keeping with *Heller*")). Add to that the latest endorsement of felon disarmament in *United States v. Rahimi* where the Supreme Court upheld the constitutionality of a related subsection of 18 U.S.C. § 922(g) — section 922(g)(8) —

prohibiting the possession of firearms by a person subject to a domestic violence restraining order. *See* 602 U.S. ----, ---, 2024 WL 3074728, at *10 (U.S. June 21, 2024) (referencing's *Heller*'s statement that "many such prohibitions [against firearm possession], like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful'").

This Court acknowledges that those statements of constitutionality must be considered *obiter dicta*, however, since the constitutionality of section 922(g)(1) was not squarely before those courts. And lower courts "are obligated to follow Supreme Court dicta." *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002) (citation omitted). Nonetheless, the Sixth Circuit has observed that those pronouncements "only established a presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis." *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 686 (6th Cir. 2016). As a consequence, this Court's analysis in *Keels* is too superficial to provide a clear answer to the question Jones presents here; a more probing analysis of "the principles that underpin our regulatory tradition" of firearm laws is required. *Rahimi*, 2024 WL 3074728, at *6 (citing *Bruen*, 597 U.S. at 26-31).

The challenged statute, 18 U.S.C. § 922(g)(1), states:

> It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1). Jones argues that this law is facially unconstitutional, a "difficult challenge," *United States v. Salerno*, 481 U.S. 739, 745 (1987), where he "must establish that *no set of circumstances* exists under which the [statute] would be valid," *United States v. Hansen*, 599 U.S. 762, 769 (2023) (quoting *Salerno*, 481 U.S. at 745); *see L. W. by & through Williams v. Skrmetti*, 83 F.4th 460, 489 (6th Cir.), *cert. granted sub nom. United States v. Skrmetti*, No. 23-

477, 2024 WL 3089532 (U.S. June 24, 2024). It is not apparent from Jones's brief that he also contends that the statute is unconstitutional as applied to him.

As an initial matter, the government argues that Jones waited too long to file his motion. He has, in fact, pleaded guilty to the indictment. However, Jones switched attorneys midstream in the case, and his new lawyer sought to preserve the constitutional issue by filing the motion to dismiss. That course is understandable, since the law in this area was thrown into flux by *Bruen*'s announcement of a new test. And this Court has considerable discretion to "extend or reset the deadline" for making such motions. Fed. R. Crim. P. 12(c)(2). It is appropriate to permit Jones to mount his challenge here.

Turning to the question at hand, *Bruen* asks first whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 24. Some courts have held that the term "the people" in the Second Amendment should not be read to include felons. *E.g.*, *United States v. Daniels*, 77 F.4th 337, 343 (5th Cir. 2023) (indicating that "when *Heller* and *Bruen* used the phrase 'law-abiding,' it was just short-hand to exclude from the . . . discussion the mentally ill and felons, people who were historically stripped of their Second Amendment rights") (cleaned up), *cert. granted judgment vacated*, No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024) (mem.); *United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir. 2023), *rev'd on other grounds,* 602 U.S. ---, 2024 WL 3074728 (U.S. June 21, 2024) (same, and adding that "*Bruen*'s reference to 'ordinary, law-abiding' citizens is no different"); *Binderup v. Att'y Gen. United States of Am.*, 836 F.3d 336, 348 (3d Cir. 2016) (quoting *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'")), *abrogated*

*by Range v. Att'y. Gen.*, 69 F.4th 96 (3d Cir. 2023), *cert. granted, judgment vacated sub. nom. Garland v. Range*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024).

That is not a favored view. Although the *Heller* Court stated that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," 554 U.S. at 625, it also looked to the other six instances in the Constitution where the phrase "the people" is found and concluded that it "unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. That observation led to the conclusion that the Second Amendment right presumptively "belongs to all Americans." *Id.* at 581. Most other courts addressing that issue accept that reasoning, and so do I. *See Range v. Att'y Gen.*, 69 F.4th 96, 101 (3d Cir. 2023); *United States v. Goins*, 647 F. Supp. 3d 538, 547 (E.D. Ky. 2022); *United States v. Williams*, No. 23-20201, 2024 WL 731932, at *8-10 & n.16 (E.D. Mich. Feb. 22, 2024) (citing cases).

Jones enjoys the protection of the Second Amendment, but the right secured by that Amendment "is not unlimited." *Heller*, 554 U.S. at 626. *Bruen* says that the right may be curtailed by Congress if the statutory prohibition "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The government bears the burden on that point. *Ibid.*

In *Rahimi*, the Supreme Court provided some insight into how courts should approach that analysis. Mentioning that the Second Amendment allows "more than just those regulations identical to ones that could be found in 1791," the Court directed that lower tribunals "must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Rahimi*, 2024 WL 3074728, at *6 (cleaned up). Contemporary laws that address problems similar to those addressed by the restrictions of the time likely are permissible. *Ibid.*

They need not "precisely match its historical precursors" to "pass constitutional muster." *Ibid.* (quoting *Bruen*, 597 U.S. at 30). And although it "must comport with the principles underlying the Second Amendment," the contemporary restriction "need not be a dead ringer or a historical twin." *Ibid.* (cleaned up). Finally, when drawing analogies to historical regulations, courts should consider "[w]hy and how the regulation burdens the right" to bear arms. *Id.* at *6 (citing *Bruen*, 597 U.S. at 29).

Although *Rahimi* did not deal with the disarmament of felons under section 922(g)(1), some of its observations are illuminating. The Court stated, for instance, that "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Id.* at *7. The historical analogs the Court cited are the surety laws and the "going armed" laws. *Id.* at *7-9. Some felons fit neatly into that category of prohibited persons, although others may not. *See, e.g.*, *Range*, 69 F.4th at 105-06 (holding that the felony of food stamp fraud could not constitutionally bar an individual from later possessing a firearm). But because Jones challenges the law on its face, he must show that no application of section 922(g)(1) can pass the test, and surely one convicted of second-degree arson can "pose a credible threat to the physical safety of others." Moreover, the *Rahimi* Court made a point to mention that disarmament can be justified "once a court has found that the defendant" represents an objectionable threat, *Rahimi*, 2024 WL 3074728, at *9, as may be the case with every felon, since the full panoply of due process rights must have been allowed before conviction.

Considering the full measure of disability imposed on felons by section 922(g)(1), one must ask whether there are historical analogs to contemporary laws that prohibit all felons from possessing firearms. Stated another way, in the context of an as-applied challenge, can all felons be thought to "have been found to pose a credible threat to the physical safety of others"? *Id.* at

*10. If the answer is in the affirmative, then section 922(g)(1) easily passes *Bruen*'s (and *Rahimi*'s) test. "Our tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Ibid.* And for facial challenges, constitutionality is found more easily, since it is beyond debate that *some* felony convictions are reliable proxies for threatened future dangerousness.

Despite this pronouncement, though, *Rahimi* does not provide the authority for the disarmament of all felons across the board, as section 922(g)(1) nearly does. *Rahimi* holds only that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at *11.

There are, however, historical analogs that demonstrate the founding generation's comfort with laws that except those convicted of serious crimes — felons — from the people's right to bear arms. The United States — and their colonial forerunners — have had a long history of "disarm[ing] individuals whose conduct indicated that they could not be trusted to abide by the sovereign and its dictates." *Range*, 69 F.4th at 120 (Krause, J., dissenting). Judge Krause's dissent in *Range* demonstrates in detail how the law in England during the 17th and 18th centuries, laws in colonial America, and laws enacted during the Revolutionary War all reveal an understanding of the propriety — indeed, a perceived need — among members of the founding generation with disarming groups who could not be expected to abide by the law. *Id.* at 121-26. Judge Krause also pointed to an amendment, ultimately never adopted, that would have protected the right to bear arms except for those who committed crimes. *Id.* at 126. Despite never making it into the Constitution, the amendment "reflect[ed] the understanding of the Founding generation — particularly among those who favored enshrining the right to armed self-defense in the Constitution — that 'crimes committed,' whether dangerous or not, justified disarmament." *Ibid.*

Next, she noted that "the ubiquity of the death penalty suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament." *Id.* at 126-27. She also found persuasive the historical fact that some non-capital offenses triggered the loss of an offender's estate, including any firearms they owned, on a basis that could be permanent. *Id.* at 127.

These analogs provide ample evidence that the tradition of firearm regulation addresses the disarmament of individuals (how) whose conduct displayed a disregard for the law and who could not be trusted to abide by the sovereign's rules (why).

Other courts have viewed these historical analogs differently. For instance, *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), a panel of the Ninth Circuit read the laws dispossessing Loyalists of their weapons as merely temporary measures affecting those who refused to take an oath of allegiance and not as lifetime bans. *Id.* at 683. The panel explained that restrictions affecting Catholics, Indians, slaves and free Blacks were justified on the basis that these groups were outside the political community and that the restrictions still often allowed for case-specific exceptions. *Id.* at 684-88. The panel also took issue with the government's argument that the founding generation would have understood a felon to lack a right to possess a firearm because he would have faced death and total estate forfeiture for his crimes. The evidence that felonies were regularly punished in practice by death or total forfeiture is shaky, the panel reasoned, and the term "felony" has proved a mutable concept since the founding era. *Id.* at 688-89. The panel demanded that the government proffer founding-era "felony analogues that are distinctly similar to [the defendant's] underlying offenses and would have been punishable either with execution, with life in prison, or permanent forfeiture of the offender's estate." *Id.* at 690-91 (cleaned up). The panel found that the government had failed to provide sufficient evidence that any of the defendant's

prior convictions — for vandalism, being a felon in possession of a firearm, drug possession, or evading a peace officer — were serious enough by Founding era standards to justify depriving the defendant of his present-day right to possess a handgun and that a § 922(g) charge was unconstitutional as applied to him. *Ibid.*

Similar reasoning was employed by a judge in this district in *United States v. Williams*, --- F. Supp. 3d ---, 2024 WL 731932 (E.D. Mich. Feb. 22, 2024), although the court there considered only an as applied challenge. The court determined that the government had not carried its burden of demonstrating that section 922(g) was consistent with the Nation's history of firearms regulation because it did not point to any historical law categorically disarming felons dating to the Second Amendment's ratification. The court did not accept the historical analogues proffered by the government — early statutes that disarmed groups of "untrustworthy" individuals and laws that authorized capital punishment or the forfeiture of one's estate for certain felonies. The disconnect, the court reasoned, mainly was that the historical regulations did not impose lifetime bans. *Id.* at *20-25.

Neither of these cases (and a handful of others reaching similar conclusions) appears to question the "why" of the contemporary regulation or its historical analogs. The perceived problem evidently was the danger of allowing irresponsible individuals to possess lethal firearms, while permitting the general population to bear arms for self-defense. That is the same objective of contemporary laws regulating firearm possession. That observation is validated by *Bruen*'s declaration that "nothing in [the Court's] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes . . . [,] which often require applicants to undergo a [criminal] background check" and "are designed to ensure only that those

bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 591 U.S. at 38 n. 9 (quoting *Heller*, 554 U.S. at 635).

Both *Duarte* and *Williams* question the "how" of the modern-era laws, unable to find an acceptable analog to the supposed lifetime ban imposed by section 922(g)(1). That reasoning, however, strays from the proper analogical examination by focusing on a search for a "historical twin," rather than considering whether the historical regulations are "relevantly similar" to contemporary laws. *See Rahimi*, 2024 WL 3074728, at *9.

Both courts expressed concern that the burden imposed by section 922(g)(1) — a lifetime ban on firearm possession for those convicted of felonies — is comparably more severe than the historical examples proffered by the government, which allowed some avenues for disarmed individuals to regain their rights, typically upon making a declaration of loyalty or receiving a permit. *Williams*, 2024 WL 731932 at *20-21; *Duarte*, 101 F.4th at 683. But these concerns ignore the fact that section 922(g)(1) does not function as a permanent bar for every individual convicted of a felony. The statute, upon closer examination, is more textured: it does not apply to "Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices," 18 U.S.C. § 921(a)(20)(A), nor does it apply to "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored," *id.* § 921(a)(20)(B).

A felon also may seek removal of his or her disability by applying to the Attorney General if the person can establish that their "record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." *Id.* § 925(c); *see also* 27 C.F.R. § 478.144. That allowance is relevantly similar to the loyalty declarations of old. That pathway has been criticized as an

impractical solution because Congress has not provided funding for processing those applications since 1992.  *United States v. Berry*, --- F. Supp. 3d ---, 2024 WL 1141720, at *18 (N.D. Ohio March 15, 2024).  Even so, it is not accurate to characterize section 922(g)(1) as a lifetime ban in all instances.

In *Williams*, the court also looked askance at historical examples of laws authorizing capital punishment or total forfeiture, stating that these laws did not operate as status-based offenses and did not *necessarily* result in a lifetime deprivation of access to weapons.  *Williams*, 2024 WL 731932 at *24.  Again, Judge Krause's *Range* dissent offers a thoughtful rebuttal:

> *A fortiori*, the ubiquity of the death penalty suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament.  Indeed, under English law, executed felons traditionally forfeited all their firearms, as well as the rest of their estate, to the government.  That practice persisted in the American colonies and the Early Republic.  Even some non-capital offenses triggered the permanent loss of an offender's estate, including any firearms.  For example, a 1786 New York statute punished those who counterfeited state bills of credit with life imprisonment and the forfeiture of their entire estate.  Again, this drastic punishment indicates that the Founding generation would not have considered the lesser punishment of disarmament beyond a legislature's authority.

*Range*, 69 F.4th at 126-27 (Krause, J., dissenting).  The *Williams* court's concern that these punishments did not operate to deprive members of a class of the right to possess a firearm also fails to account for the provisions in section 921(a), mentioned above, that permit the restoration of rights in the case of individuals who receive pardons or expungements.  And it focuses the inquiry too narrowly on the *means* of the statute's operation rather than the operative question whether a historical example is "analogous enough," obviating an unproductive search for a "historical *twin*."  *Rahimi*, 2024 WL 3074728, at *6.  As Judge Krause explained, it has to be the case that the founding generation would have viewed life disarmament, a comparatively less severe punishment, as an appropriate consequence for those it would otherwise have *executed*.  *See also United States v. Deryke*, No. 23-92, 2023 WL 7101902, at *7 (W.D. Mich. Oct. 27, 2023) ("If the

state could deprive a felon of life for forgery at the founding, then it stands to reason that they can deprive a felon of the right to bear arms today.").

Even accounting for some of the incongruity between historical and contemporary firearm regulation, there is sufficient evidence in the nation's history and tradition to satisfy the government's burden to show persuasive historical analogues to the challenged regulation. The statute prohibiting most felons from possessing firearms is not unconstitutional on its face.

Jones's particular case amply demonstrates why section 922(g)(1) survives a facial challenge. His underlying arson conviction (combined with a dearth of evidence indicating his reformation) clearly puts him within the cohort of individuals who have been adjudicated as having threatened physical harm to others. Even if there is some doubt whether the laws in effect at the founding provide historical support for disenfranchisement of *all* felons, those laws easily serve as proxies for historical analogues that disarmed individuals deemed to be dangerous. *See Berry*, 2024 WL 1141720, at *19-20. The government points out that the defendant admitted in his motion that he was convicted of second-degree arson. In Michigan, an individual is liable for second-degree arson when he "willfully or maliciously burns, damages, or destroys by fire or explosive a dwelling, regardless of whether it is occupied, unoccupied, or vacant at the time of the fire or explosion, or its contents." Mich. Comp. Laws § 750.73. The crime is punishable by up to 20 years in prison or by a fine representing three times the value of property destroyed. *Ibid.* Arson was undoubtedly as serious an offense at the time of the founding. *See Range*, 69 F.4th at 127 n.97 (Krause, J., dissenting) (noting that Pennsylvania punished arson with life imprisonment and estate forfeiture); *United States v. Hairston*, No. 23-00020, 2024 WL 326667, at *6 (D. Conn. Jan. 29, 2024) (citing New York law punishing arson by death); *United States v. Brown*, No. 23-CR-00075, 2024 WL 500719, at *2 (W.D.N.C. Feb. 8, 2024) (same in North Carolina). The

defendant's arson conviction, which is partially responsible for his section 922(g)(1) charge, is undoubtedly consistent with founding-era efforts to disarm dangerous individuals. *See United States v. Zelaya Hernandez*, 678 F. Supp. 3d 850, 859 (N.D. Tex. 2023) (rejecting facial challenge to section 922(g)(1) raised by individual who was previously convicted of attempted arson of a structure). Arson was at the founding a felony punishable by "a total forfeiture of either lands, or goods, or both, at the common law, and to which capital or other punishment may be superadded, according to the degree of guilt." *United States v. Coleman*, --- F. Supp. 3d ----, 2023 WL 6690935, at *10 (E.D. Va. Oct. 12, 2023) (quoting 4 William Blackstone, *Commentaries on the Laws of England* 95 (Harper ed. 1854)). It was, in the eyes of contemporary commentators, one of the most serious common law crimes because it was an offense against the habitation and potentially more destructive than murder. *See* John Poulos, *The Metamorphosis of the Law of Arson*, 51 Mo. L. Rev. 295, 299-300 (1986). The founding generation undoubtedly would be surprised by a scheme that permitted convicted arsonists — who would have been considered highly dangerous individuals — to retain their weapons. The Court is confident that the United States may enforce section 922(g)(1) against the defendant in a manner consistent with the Second Amendment due to his propensity for dangerous criminal activity.

### III.

The prohibition against felons possessing firearms found in 18 U.S.C. § 922(g)(1) is consistent with the principles that underpin the Nation's regulatory tradition of firearm regulation. That statute is relevantly similar to the historical regulations, and those analogs satisfy the government's burden to establish that the law is consistent with the Second Amendment. The statute under which defendant Jones is charged is not facially unconstitutional, nor is it unconstitutional as applied to him.

- 15 -

Accordingly, it is **ORDERED** that the defendant's motion to dismiss the indictment (ECF No. 39) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   July 2, 2024